IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| MIA LUNA, INC.,<br><br>   Plaintiff,<br><br>     v.<br><br>SHERIFF VICTOR HILL<br>individually and in his official<br>Capacity as Sheriff of Clayton County,<br>et al.,<br><br>   Defendants. | CIVIL ACTION FILE<br>NO. 1:08-CV-585-TWT |

ORDER

This is a section 1983 action. It is before the Court on the Defendant Sheriff Victor Hill's Motion to Dismiss [Doc. 4]. For the reasons set forth below, it is granted in part and denied in part.

I. Background

The Plaintiff is the owner of an adult entertainment club known as the "Pink Pony South." The club, located south of Atlanta in Forest Park, Georgia, opened on February 13, 2008. The Defendant is the Sheriff of Clayton County, Georgia. The Plaintiff alleges that the day after the club opened, the Defendant began operating roadblocks "on a nearly nightly basis" on the main access road into the club. (Comp.

¶ 11(a)). These roadblocks, the Plaintiff claims, were set up "for the express purpose of interfering with Plaintiff's business and the exercise of first amendment rights inherent in Plaintiff's business." (Id.) When motorists were stopped at the roadblocks, the deputies allegedly threatened potential patrons and told "patrons falsehoods regarding conditions in Plaintiff's business." (Id. ¶ 11(c)). The Plaintiff contends that the roadblocks, among other things, violated free expression rights protected by the First and Fourteenth Amendments and constituted improper searches and seizures under the Fourth and Fourteenth Amendments. After the suit was filed, the Plaintiff voluntarily dismissed Clayton County as a Defendant. Further, on May 20, 2008, this Court preliminarily enjoined the Defendant from operating roadblocks in the immediate vicinity of the Plaintiff's business [Doc. 16]. The Defendant Hill now moves to dismiss all claims.

## II. Motion to Dismiss Standard

A complaint should be dismissed under Rule 12(b)(6) only where it appears that the facts alleged fail to state a plausible claim for relief. Bell Atlantic v. Twombly, 127 S. Ct. 1955, 1965-66 (2007); Fed. R. Civ. P. 12(b)(6). A complaint may survive a motion to dismiss for failure to state a claim, however, even if it is improbable that a plaintiff would be able to prove those facts, and even if the possibility of recovery is extremely remote and unlikely. Twombly, 127 S. Ct. at 1965 (citations and

quotations omitted). In ruling on a motion to dismiss, the court must accept the facts pleaded in the complaint as true and construe them in the light most favorable to the plaintiff. See Quality Foods de Centro America, S.A. v. Latin American Agribusiness Dev. Corp., S.A., 711 F.2d 989, 994-95 (11th Cir. 1983); see also Sanjuan v. American Bd. of Psychiatry and Neurology, Inc., 40 F.3d 247, 251 (7th Cir. 1994) (noting that at the pleading stage, the plaintiff "receives the benefit of imagination"). Generally, notice pleading is all that is required for a valid complaint. See Lombard's, Inc. v. Prince Mfg., Inc., 753 F.2d 974, 975 (11th Cir. 1985), cert. denied, 474 U.S. 1082 (1986). Under notice pleading, the plaintiff need only give the defendant fair notice of the plaintiff's claim and the grounds upon which it rests. See Erickson v. Pardus, 127 S. Ct. 2197, 2200 (2007).

## III. Discussion

### A. Eleventh Amendment Immunity

The Defendant argues that he is entitled to immunity with respect to the claim against him in his official capacity. Eleventh Amendment immunity bars suits in federal court against state agents and state instrumentalities. Regents of the Univ. of Ca. v. Doe, 519 U.S. 425, 429 (1997). A state entity is entitled to Eleventh Amendment immunity when it is considered an "arm of the state" and recovery of money against that entity is, in essence, a recovery against the state. Id. at 429-30; see

also Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 280 (1977). The Eleventh Circuit has held that Eleventh Amendment immunity applies to county sheriffs in Georgia while they are performing certain functions. Manders v. Lee, 338 F.3d 1304 (11th Cir. 2003). However, the Eleventh Circuit explicitly refused to categorically find a Georgia sheriff to be an arm of the state. Id. at 1309 n.9 ("[T]he relevant question is not whether [the sheriff] acts for the State or [the county] in some categorical all or nothing manner in connection with the county jail. Instead, the proper inquiry is whether [the sheriff] acts for the State or [the county] in the particular functions at issue today."). The factors weighed in determining whether an official is an arm of the state are: (1) how state law defines the entity; (2) where state law vests control; (3) from where the entity derives its funds; and (4) liability for and payment of adverse judgments. Id. at 1309.

In discussing the first factor, the Manders court made clear that, structurally, it considered Georgia sheriffs to be state officers. Id. at 1319 ("Most of [a sheriff's] duties are an integral part of the State's criminal justice system and are state functions."). The seeming constraints of Manders were noted by another district court:

> While the decision in Manders does not conclusively compel this Court to find that [the defendant sheriff] was acting as an arm of the state in implementing policies pertaining to roadblocks . . . it appears to the Court that the policies at issue here flow from the powers granted to

>sheriffs under state law, rather than from any authority or control derived from [the county].

Scruggs v. Lee, No. 05-95, 2006 WL 2850427, at *5 (M.D. Ga. Sep. 30, 2006). This case, although it also involves roadblocks, differs because the Plaintiff alleges that the Defendant is not exercising authority derived from the state. The Georgia Constitution forbids any county from exercising the power of police protection within a municipality except by contract with that municipality. See GA. CONST. Art. 9, § 2, ¶ III (a)-(b). O.C.G.A. § 15-16-13 authorizes sheriffs to "contract with the governing body of any municipal corporation located within [the sheriffs'] respective counties, with the written consent of the governing authority of the county, for the purpose of providing law enforcement services to the municipal corporation." Id. The Plaintiff claims that the Defendant Hill has no such contract with the City of Forest Park - and therefore no written consent - allowing his department to conduct law enforcement activities in Forest Park.

Under Manders, the "key question is not what arrest and force powers sheriffs have, [but rather] *for whom* sheriffs exercise that power." Id. at 1319 n.35. Because the Defendant's actions were allegedly ultra vires, this case does not neatly yield itself to the dichotomy described in Manders. Cf. id. at 1331 ("[T]he issue is not the state versus the county; rather, the issue is whether the sheriff is an arm of the state *vel non*.") (Anderson, J., dissenting). An ultra vires law enforcement action obviously

would not be derived from the state. Yet, more broadly, the state granted sheriffs those duties (including roadblocks) "which necessarily appertain to his or her office." O.C.G.A. § 15-16-10(a)(8). Therefore, the first factor necessarily tilts towards immunity.

The next consideration under the arm of the state analysis is where the state law vests control. As described in Manders, this factor cuts in favor of immunity because Georgia requires sheriffs to be trained annually, the Governor may discipline sheriffs, and counties exert little or no control over sheriffs. Id. at 1320-23. The Manders court - though careful to note that its interpretation only applied within in the context of prison use of force policies - said this factor weighed heavily in favor of immunity. Again, its analysis is inescapable. Because Georgia mandates sheriff training and discipline generally, the second factor cuts in favor of immunity under seemingly universal circumstances. Cf. Johnson v. Ogeechee Behavioral Health Services, 479 F. Supp. 2d 1357, 1365 (S.D. Ga. 2007) ("The reasoning in Manders is suspect. . . . [T]he power to discipline constitutes the power to control, so the State exercises some control over [the defendant] and the second Manders factor cuts slightly toward Eleventh Amendment immunity.").

The Manders court found the third factor - from where a sheriff's office derives its funds - as "sufficient to tilt the third factor of the Eleventh Amendment analysis

toward immunity." Id. at 1324. The Eleventh Circuit reached that conclusion even while conceding that the county "bears the major burden of funding [the sheriff's] office and its jail." Georgia, the court found, funds the sheriffs' annual training and discipline. Additionally, the state mandates the funding of the sheriffs' offices, minimum salaries of sheriffs. Conversely, counties may set "the total budget but cannot dictate how [their sheriffs spend] it." Id. at 1323. The Manders court reiterated the limited scope of its finding: Because state law does not "always speak with perfect clarity," the court "narrowly" determined only that the third factor tilted in favor of the arm of the state when a sheriff was establishing force policy. Id. at 1324 n.45. It is difficult to distinguish that narrow holding from most other functions of Georgia sheriffs.

The final factor is which level of government must pay for any adverse judgment against the Defendant. The Manders court determined that neither a county nor the state was directly liable for any adverse judgment against a sheriff. Id. at 1326-28. A sheriff suffering an adverse judgment would have to pay out of his or her own office. Id. at 1327. A sheriff would have to recoup those funds from somewhere, and the Eleventh Circuit predicts that a sheriff would seek funds (hat-in-hand) from both county and state. Id. Further shoring up its analysis, the Manders court noted that regardless of whether the state was ever actually on the hook or not (and

regardless of the phrasing of the factor), the factor exists to ensure states are treated with due dignity and integrity. Id. Apparently, allowing a suit against a tangential state officer is an affront to those sensibilities. The Eleventh Circuit concluded that "at a minimum," the fourth factor would not defeat Eleventh Amendment immunity.

I fail to see how the narrow holding of Manders does not compel immunity in this case. The Manders court cautioned against categorically granting Georgia sheriffs Eleventh Amendment immunity in their official capacities. In application, the analysis in Manders is so strong it forces a logical conclusion that Eleventh Amendment immunity almost automatically attaches for a Georgia sheriff (even where that sheriff's actions were allegedly ultra vires). Cf. Dukes v. Georgia, 428 F. Supp. 2d 1298, 1319 (N.D. Ga. 2006) (noting that Manders specifically excepted cases of providing medical care to inmates from its arm of the state analysis). The Defendant Hill is entitled to Eleventh Amendment immunity, and the claims against the Defendant in his official capacity should be dismissed.

B. First Amendment Claims

The Plaintiff's claims survive against the Defendant in his individual capacity. The Defendant is not entitled to qualified immunity. Under qualified immunity principles, even if the Defendant acted unconstitutionally, he may be shielded from

liability for civil damages if he did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." Hope v. Pelzer, 536 U.S. 730, 739 (2002) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Qualified immunity protects government officials from suits in their individual capacities so long as they were performing discretionary functions. McClish v. Nugent, 483 F.3d 1231, 1237 (11th Cir. 2007).

The Plaintiff has alleged facts that may show the Defendant is not performing a discretionary function when he is conducting the roadblocks. Officials act within their discretion when (1) such actions are undertaken pursuant to the performance of their official duties; and (2) the actions fall within the scope of their authority. See Collier v. Dickinson, 477 F.3d 1306, 1307 n.1 (11th Cir. 2007) (sale of motor vehicle record information to mass marketers was within in the scope of discretion authority for DMV officials). Showing that the actions were discretionary is the Defendant's responsibility. Lenz v. Winburn, 51 F.3d 1540, 1545 (11th Cir. 1995). Without discussion, the Defendant maintains only that his actions were "undeniably both lawful and discretionary." (Def.'s Mot. to Dismiss, at 9).

Yet, as discussed above, the Plaintiff has alleged that the Defendant had not properly contracted with the City of Forest Park to conduct law enforcement activities within the municipality. Without "written consent of the governing authority of the

county," the Defendant was presumably acting outside the scope of his authority. O.C.G.A. § 15-16-13. If that allegation proves to be true, the Defendant will not be eligible for qualified immunity. See Harlow, 457 U.S. at 818 ("[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages . . .").

Even assuming that the Defendant's actions were discretionary, determining whether an official is entitled to qualified immunity requires asking two additional questions. Saucier v. Katz, 533 U.S. 194, 201 (2001). First, viewing the facts in the light most favorable to the party asserting the injury, do the facts show that the official's conduct violated a constitutional right? Second, was the right clearly established? Id. The Plaintiff alleges violations of its First Amendment right of free expression and of its customers' Fourth Amendment rights against unreasonable searches and seizures.

The Supreme Court has explained that the salient question for the purpose of determining whether a right was "clearly established" is whether the state of the law at the time of the violation gave the official fair warning that his alleged treatment of the individual was unconstitutional. Hope, 536 U.S. at 741. "While officials must have fair warning that their acts are unconstitutional, there need not be a case 'on all fours,' with materially identical facts, before we will allow suits against them."

Holloman v. Harland, 370 F.3d 1252, 1277 (2004) ("This circuit was recently chastised by the Supreme Court for taking an unwarrantedly narrow view of the circumstances in which public officials can be held responsible for their constitutional violations.").

In Vinyard v. Wilson, 311 F.3d 1340, 1349-55 (11th Cir. 2002), the Eleventh Circuit held that a right is clearly established: (1) where specific words in the federal statute or constitutional provision render the law applicable to the challenged conduct; (2) where judicial decisions clearly apply to a wide variety of factual circumstances; and (3) where precedents involve materially similar facts. Id. at 1350-51. A plaintiff may overcome the qualified immunity defense without relying on fact-specific caselaw when a preexisting constitutional rule applies with "obvious clarity." Id. at 1352.

This case fits within the second category of Vinyard. First, as alleged, the roadblocks constituted a prior restraint on protected expression, which are strongly presumed to be unconstitutional. See United States v. Frandsen, 212 F.3d 1231, 1237 (11th Cir. 2000). "A prior restraint on expression exists when the government can deny access to a forum for expression before the expression occurs." Id. at 1236-1237. The Eleventh Circuit has characterized similar prior restraints as "unconstitutional conditions" requiring citizens to "surrender their Fourth Amendment

rights . . . in order to exercise their First Amendment Rights." Bourgeois v. Peters, 387 F.3d 1303, 1316-17 (11th Cir. 2004). Here, the Plaintiff has alleged that the Defendant restricted access to its venue and searched and seized incoming patrons by operating roadblocks. To be sure, Frandsen and Bourgeois involved restrictions on political speech, which is more highly protected than adult entertainment. Nonetheless, exotic dancing enjoys First Amendment protection. Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee County, Fla., 337 F.3d 1251, 1256 (11th Cir. 2003) (citing California v. LaRue, 409 U.S. 109 (1972)). The Defendant was on notice of constitutional problems stemming from prior restraints of expression.

Additionally, there is more specific judicial precedent that is factually analogous to this case (and could put this case within the third category described in Vinyard). The Eleventh Circuit has previously held that harassing behavior by law enforcement - including the use of roadblocks - may unlawfully impinge on First Amendment rights. Bennett v. Hendrix, 423 F.3d 1247, 1249 (11th Cir. 2005). The plaintiffs in Bennett were suing under a theory of retaliation for exercise of their First Amendment rights. Yet the reasoning that harassment by law enforcement - including the use of targeted roadblocks - improperly chills free speech applies with equal force in this case. Id. at 1253-54. The Defendant was on notice that roadblocks specifically could constitute an improper restriction on expression.

C. Fourth Amendment Claims

The Plaintiff alleges that the roadblocks were unreasonable searches and seizures under the Fourth and Fourteenth Amendments. I note at the outset there is an issue as to whether the Plaintiff has standing to vindicate the Fourth Amendment rights of its patrons.[1] Article III of the Constitution commands that the judicial power of the United States shall extend only to "cases" and "controversies." A party has standing within the meaning of Article III when it establishes three elements: (1) injury; (2) causation; and (3) redressability. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992). Unless a party can meet these standing requirements, a federal court has no jurisdiction to hear the case. In addition to these constitutional requirements, federal courts may decline to exercise jurisdiction for prudential reasons. Young Apartments, Inc. v. Town of Jupiter, Fla., 529 F.3d 1027, 1038 (11th Cir. 2008). These requirements are whether the complaint: (1) falls within the zone of interest protected by the applicable statute or constitutional provision; (2) raises

---

[1] Under this factual scenario, the Plaintiff more clearly has standing to assert First Amendment violations. Limiting patrons' right to witness protected expression naturally impinges upon those performing the protected expression. In other words, expression loses its meaning with no audience. Moreover, the Supreme Court has determined that vendors of adult entertainment have standing to assert First Amendment rights of their patrons generally. Virginia v. American Booksellers Ass'n, Inc., 484 U.S. 383, 392-94 (1988). I also note that the Defendant has not raised the issue of standing against any of the claims.

abstract questions and generalized grievances more appropriate for the legislature to decide; and (3) asserts the plaintiff's own legal rights and interests rather than the legal rights and interests of third parties. Id. at 1039 (citing Warth v. Seldin, 422 U.S. 490, 499-500 (1975)). The principles "are not constitutionally mandated, but rather stem from a salutary 'rule of self-restraint' designed to minimize unwarranted intervention into controversies where the applicable questions are ill defined and speculative." Id. at 1041 (quoting Craig v. Boren, 429 U.S. 190, 193 (1976)). Therefore, prudential rules are subject to certain exceptions. Courts have previously allowed businesses to advocate on behalf of their clients and customers. Young Apartments, 529 F.3d at 1041. In fact, "vendors and those in like positions have been *uniformly* permitted to restrict those efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function." Craig, 429 U.S. at 195 (emphasis added); see also Color Pigments Mfrs. Ass'n, Inc. v. Occupational Safety & Health Admin., 16 F.3d 1157, 1160 n.1 (11th Cir. 1994) (describing holding of Craig as "standing based on vendor's assertion of vendee's rights approved."). A vendor may bring claims on behalf of third parties if the vendor suffered an injury-in-fact such that the vendor has a concrete interest in the dispute, the vendor has a close relation to the third party, and some hindrance prevents the third party from protecting its own interests. Young Apartments, 529 F.3d at 1042.

For the first factor under the third party standing test, it is clear that the Plaintiff has a sufficiently concrete interest in the outcome of the dispute. A business's "pursuit of economic damages is sufficient to ensure that it would be an effective advocate in this dispute." Id. This interest is particularly strong where economic injuries may not be remedied even if the patrons brought a suit themselves. Id. The Plaintiff has alleged economic injury due to the sheriff's law enforcement activities at issue. (See, e.g., Comp. ¶ 40). Threatening a business's potential patrons could naturally have a negative economic impact on that business. Further, any economic recovery by those individuals stopped at roadblocks would not compensate the Plaintiff for potentially lost revenues.

With regard to the second factor, the interests of a litigant and third party need not be "intimately close" nor identical, only "sufficiently close." Young Apartments, 529 F.3d at 1042. The vendor-vendee relationship between the Plaintiff and its customers is a "sufficiently close" relationship to satisfy the second factor. Id.; see also Harris v. Evans, 20 F.3d 1118, 1123 (11th Cir. 1994) (noting that vendor-vendee relationship satisfies substantial relation test).

Finally, those individual patrons that encountered roadblocks would be hindered from asserting their own rights in this case. First, the Supreme Court has previously found a hindrance to patrons of adult entertainment when enforcement of

a statute would limit access to protected expression.  See Virginia v. American Booksellers Ass'n, Inc., 484 U.S. 383, 392-93 (1988).  Additionally, it may prove difficult to identify individuals actually stopped by the roadblock.  Young Apartments, 529 F.3d at 1043 (noting that inability to identify appropriate plaintiffs is one - but not the only - reason to grant third-party standing).  There is surely no record of individuals who were stopped.  Further, there may be an element of shame deterring individuals to litigate on their behalf.  It is unlikely that many of the Plaintiff's customers will be bold enough to publicly vindicate their right to be free of improper searches before patronizing a strip club.  Because of these considerations - in addition to the vendor-vendee relationship generally - the Plaintiff should have third-party standing to raise its patrons' Fourth Amendment claims at least for injunctive relief.

The Defendant argues that he is entitled to qualified immunity for the Fourth and Fourteenth Amendment claims.  As discussed above, as pled by the Plaintiff, the Defendant was acting outside of his jurisdiction, and his actions were not within his scope of authority.  As such, the factual allegations indicate that the Defendant is not entitled to qualified immunity.  Even assuming the Defendant was acting within his discretion, the Plaintiff's allegations preclude the Defendant from receiving qualified immunity.

To conform with the Fourth Amendment, all searches and seizures must be reasonable; generally, a search or seizure is unreasonable without individualized suspicion of wrongdoing. City of Indianapolis v. Edmond, 531 U.S. 32, 37 (2000). "It is well established that a vehicle stop at a highway checkpoint effectuates a seizure within the meaning of the Fourth Amendment." Id. at 39 (citing Michigan Dept. of State Police v. Sitz, 496 U.S. 444, 450 (1990)); see also Delaware v. Prouse, 440 U.S. 648 (1979). Such roadblocks are acceptable only if they further a state's interest in "roadway safety" and are "distinguishable from the general interest in crime control." Edmond, 531 U.S. at 40.

In his briefing, the Defendant did not offer a specific reason for erecting the roadblocks. The Defendant only glosses that his "actions are performed pursuant to legitimate law enforcement initiatives." (Def.'s Mot. to Dismiss, at 13). Further, the Defendant seemingly admits that the roadblocks were designed to detect evidence of ordinary criminal wrongdoing: "At worst, Plaintiff's allegations charge Sheriff Hill with ensuring the safety and compliance with the laws of the patrons and employees of Plaintiff's adult establishment." (Id. at 11). Although the Defendant describes his alleged behavior as beneficial or innocuous, it still demonstrated unconstitutional behavior. This factual scenario fits within the third category of Vinyard's qualified immunity analysis. The Supreme Court has specifically declared:

> We have never approved a checkpoint program whose primary purpose was to detect evidence of ordinary criminal wrongdoing. Rather, our checkpoint cases have recognized only limited exceptions to the general rule that a seizure must be accompanied by some measure of individualized suspicion. We suggested in [Delaware v. Prouse] that we would not credit the "general interest in crime control" as justification for a regime of suspicionless stops. Consistent with this suggestion, each of the checkpoint programs that we have approved was designed primarily to serve purposes closely related to the problems of policing the border or the necessity of ensuring roadway safety. Because the primary purpose of the Indianapolis narcotics checkpoint program is to uncover evidence of ordinary criminal wrongdoing, the program contravenes the Fourth Amendment.

Edmund, 531 U.S. at 41-42 (citations omitted). The Supreme Court has stated clearly and repeatedly that roadblocks for general crime control are unconstitutional. Not surprisingly, Georgia courts similarly require roadblocks to be "implemented to ensure roadway safety rather than as a constitutionally impermissible pretext aimed at discovering general evidence of ordinary crime." Ross v. State, 257 Ga. App. 541, 542 (2002). Notably, Ross upheld a challenge to a roadblock in Clayton County, Georgia. Because the Defendant should have been on notice that the roadblocks were illegal, the Defendant should not benefit from qualified immunity.

IV. Conclusion

For the reasons set forth above, the Defendant Victor Hill's Motion to Dismiss [Doc. 4] is GRANTED IN PART and DENIED IN PART.

SO ORDERED, this 22 day of August, 2008.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge